NEW YORK HARBOR TOWBOAT COMPANY, Respondent, *v.* NEW YORK, LAKE ERIE AND WESTERN RAILROAD COMPANY, Appellant.

*Damages sustained by a collision — signals by vessels — evidence justifying a verdict.*

Where two boats approach each other and one signals that she is about to cross the other's bow, and the second boat signals her answer, such signal is an indication conveyed by the second vessel to the first as to how and in what way she is going to aid the maneuver of the first vessel, and upon the trial of an action brought to recover damages alleged to have been sustained by reason of the collision of such vessels, the jury has a right to determine whether the failure of the second vessel to do as she signaled she would do was not the cause of the accident, and whether, if she had so done, no collision would have occurred.

Every doubt is not required to be resolved in favor of either of the parties to a civil action, nor is it necessary to establish any proposition by conclusive testimony, in order to sustain a verdict.

APPEAL by the defendant, New York, Lake Erie and Western Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 29th day of October, 1892, upon the verdict of a jury for $1,044.10, after a trial at the New York Circuit, and also from an order entered in said clerk's office on the 7th day of November, 1892, denying the defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*G. B. Adams,* for the appellant.

*James M. Gifford,* for the respondent.

VAN BRUNT, P. J. :

This action was brought to recover damages occurring to a steamboat, the *J. G. Emmons,* of which the plaintiff was the owner and which was in collision with the ferry boat *Pavonia,* belonging to the defendant.

It appeared from the evidence that, on the morning of the 27th of October, 1884, the *Emmons* started from a pier in the North river, at the foot of King street, quite a distance above the place of collision, for Castle Garden. She proceeded down the river about 300 feet from the head of the docks. When she reached Harrison street, her engineer having found that she needed water,

sent word to the master that there was a hydrant at Harrison street, where he could get it. The boat was turned off shore to go into Harrison street, her wheel being ported and she going to the right. There is some dispute in the testimony as to how far down the river the *Emmons* went in turning to get back to Harrison street. The testimony upon the part of the plaintiff was to the effect that she commenced to turn abreast of the Harrison street pier, kept on the swing and went down the river far enough to open the Erie freight slip between piers 20 and 21, but that she did not go below or to the slip of the passenger ferry, which was the opening between the piers next below. On the part of the defendant, evidence was offered tending to show that the pilot of the *Pavonia* saw the *Emmons* between Harrison and Jay streets (Jay street being the street below Harrison) proceeding down the river, and that she had gotten so far down that her stern was between the piers of the slip above the ferry, and that the pilot, supposing that she was going on, paid no further attention to her. The next thing he saw was that the wheel of the *Emmons* was put hard a port and she came right around; and he swore that even at that time there was nothing to indicate that the *Emmons* was going to attempt to turn up the river again and cross his bow; and that the first intimation he had that the *Emmons* intended to cross his bow was that a whistle was blown, and he immediately signaled the engineer to reverse his engine and back the boat. At the same time he gave one whistle, and that his boat being backed and had almost lost her way before she came in collision with the *Emmons*, and after hearing the whistle his wheel ran amidships and stayed there until the collision.

On the other hand, upon the part of the plaintiff, the evidence was that the *Emmons* never got below the opening between the piers above the ferry and that she rounded to. The *Pavonia* was coming diagonally across the river from Pavonia Ferry, and after the *Emmons* had made three-quarters of the swing to the northward, she blew one whistle to the *Pavonia* indicating that she intended to go to the right. At this time the *Emmons* was about 400 feet from the shore, and the *Pavonia* 800 or 1,000 feet away from the *Emmons* on her way to her ferry slip. Not getting an answer to this signal, but seeing that the *Pavonia* kept on her course, she blew another similar blast when she was about 500 feet away. The

*Pavonia* then answered distinctly with one whistle. The *Emmons'* helm was still hard a port; after this whistle, the *Pavonia's* wheel was put to starboard, thus throwing the *Pavonia* directly towards the *Emmons*. The *Emmons* at the time was going at full speed, and after the second whistle a bell was rung to the engineer for extra speed. The *Pavonia's* engine was stopped at the time of the collision, and the *Pavonia's* port bow struck the *Emmons'* port wheel.

Upon this state of the evidence, it is claimed upon this appeal that the court erred in not dismissing the complaint at the close of the plaintiff's testimony upon the ground that when the *Emmons* failed to get an answer to her first whistle she should have stopped and reversed at once, attention being called to the 21st rule of navigation which was in force at the time, and which provided that every steam vessel when approaching another vessel so as to involve risk of collision shall slacken her speed, or, if necessary, stop and reverse.

In the presentation of this question it seems to us that the learned counsel for the appellant does not give the proper import to the answering by the *Pavonia* of the whistle heard from the *Emmons*. It is claimed, and that seems to be the foundation of most of the arguments presented here, that all that the answering by the *Pavonia* meant was " All right ; I hear your whistle ; I will do the best I can to aid your maneuver." We do not understand such to be the intimation conveyed by the *Pavonia* to the *Emmons* by its answering whistle. It was an indication as to how and in what way the *Pavonia* was going to aid the maneuver of the *Emmons* getting around in safety in view of the advance of the *Pavonia*. This indication was that the pilot of the *Pavonia* would port his wheel, throwing his boat to the right; and it was this maneuver the pilot of the *Emmons* had a right to rely on the *Pavonia* doing. But instead of this there was evidence that the pilot of the *Pavonia* put her helm to starboard, directly throwing the *Pavonia* into the *Emmons*. At best the evidence upon the part of the defendant is that the helm was amidships and nothing was done to change her course.

Such being the condition of the evidence the jury had a right to determine as to whether this failure to handle his boat properly upon the part of the pilot of the *Pavonia* was not the cause of the

accident and whether if this had been done no collision would have occurred. Under such circumstances the rule which has been invoked has no application.

It is further claimed as a ground for the dismissal of the complaint that the *Emmons* was proceeding in violation of common prudence, and of a legal obligation to keep away from the ferry slips. There was no evidence in this case tending to show that that had anything to do with the collision. The *Emmons* was out in the stream several hundred feet from the head of the piers. She was not interfered with by a boat coming out of the slip which could not see her, but the collision occurred with a boat which had the *Emmons* in full sight during all the time in which this swinging of the boat took place. Therefore, this point urged upon the part of the appellant does not seem to be at all applicable.

The learned court charged the jury that "It was the tug's duty to signal her intention by a single blast of her whistle before she attempted to cross the ferry boat's bow the second time, and if she did not get a single blast of the ferry boat's whistle in reply in time to accomplish the maneuver in safety it was her duty to check her speed and reduce it down to steerage way ; and if you believe she did not do so the verdict must be for the defendant."

And it is urged that the verdict is contrary to this charge.

It is true that the *Emmons* did not get a single blast from the *Pavonia* in reply to her first whistle, nor did she reduce her speed, and that a collision occurred. But the jury had a right to find that the collision was not the result of any of these circumstances. Upon her giving the second blast she got a reply indicating a certain course of conduct upon the part of the ferry boat, which they may have found was not taken, and that that was the cause of the collision.

It is further urged that the court erred in charging inspectors' rule 1 and navigation rule 18 as applicable to the case, which rules apply to the conduct of vessels approaching each other head on or nearly so.

The court charged what the law was under these circumstances, and left it to the jury to determine as to whether these rules were applicable in view of the condition of the vessels, there being a dispute in regard to their relative positions, and evidence from which

the jury might find that at the time of the whistle the vessels were head on or nearly so. It is true that the *Emmons* was swinging all the time. And that she had swung past the line of "head on" was shown by the manner of the collision. But it cannot be said that simply because her position was changing in consequence of her helm being hard a port she had no right to give a signal if the condition of affairs was such as called for the signal at the time it was given. The *Emmons* had her helm hard a port. Her pilot knew that under the circumstances the pilot of the *Pavonia*, upon hearing the whistle and giving the reply, ought to put his helm hard a port; and the jury had a right to find that if he had followed that course the collision would not have occurred.

It is further urged upon the part of the appellant that the court erred in refusing to charge certain propositions of law as requested by the defendant. But it will be seen upon an examination of these requests that numerous propositions were involved therein which it would have been improper to have presented to the jury.

The court was asked to charge the jury that "No excuse is permitted for the failure of a vessel to have a lookout, and the absence of one is evidence of fault. The only way the owners of such a vessel can escape from the legal liability for a collision with another vessel in such a case is to show that the presence of such a lookout, vigilantly attending to his duties, would not have enabled the vessel to avoid the collision. Every doubt as to the performance of the duty and the effect of the non-performance should be resolved against the owners of the vessel without a competent lookout until they vindicate themselves by testimony conclusive to the effect that absence of a lookout made no difference in the result. Therefore, unless you believe that the evidence conclusively establishes that such absence made no difference, your verdict must be for the defendant."

Here rules of law are invoked which do not obtain. Every doubt is not required to be resolved in favor of either of the parties to a civil action, nor is it necessary to establish any proposition by conclusive testimony. And furthermore, the court had charged that it was the duty of the *Emmons* to have a competent lookout, and that the rule was that lookouts must be persons of suitable experience, properly stationed on the vessel, and actively and vigilantly employed

in the performance of this duty.  But there is no rule which requires that a person may not be engaged as a lookout who at other times may have other duties to perform on the vessel.  And the jury were instructed that a failure upon the part of the plaintiff to have some person acting as lookout would be some evidence of negligence; but that the evidence in the case was that there were two persons in the pilot house of the *Emmons* acting as lookouts, and that they saw the *Pavonia* both before and after the *Emmons* attempted to go about, and he left it to the jury to say whether or not there was a competent lookout, and whether or not the absence of a lookout contributed to the accident.

The proposition submitted upon the part of the appellant went far beyond anything which any rule of law could possibly sanction in reference to the conclusiveness of evidence.  The court having already charged the jury as to the lookout, was entirely correct in refusing so erroneous a proposition as that which was submitted. Even if, as claimed by the appellant, the charge left too much to the jury and did not instruct them with sufficient particularity, the appellant's proposition gave an absolutely erroneous rule for the guidance of the jury, and in no way tended to call the attention of the court to any omission upon its part if any such existed.

The next request which it is claimed was error upon the part of the court to refuse was as follows:

"The rules of navigation require that the vessel which has the other on her own starboard (right) hand shall keep out of the way of the other.  In this case, having passed the course of the ferry boat in conformity with such rule, it was the duty of the tug to keep her course and not attempt to cross the ferry boat's bow again, unless there was ample room for her to do so without danger of collision.  Even the ferry boat's consent to an improper maneuver would not relieve the tug of the fault of attempting it when a disastrous result ensued. Therefore, if you believe there was not sufficient room for the tug to cross the bow of the ferry boat again, the tug was guilty of fault and the verdict must be for the defendant."

In this proposition are assumptions which are also contained in the statement of the facts by the counsel for the appellant which have not the slightest particle of evidence to sustain them.  They are that the *Emmons,* before she commenced to turn, had passed the

course of the ferry boat, and had once crossed the boat's bows, when the evidence upon the part of the plaintiff was that she had not reached, and never did reach, the ferry slip; and the most that can be said of the evidence upon the part of the defendant is that her stern had gotten to the pier of the ferry slip, but that she did not cross the course of the ferry boat, nor did she cross her bows, so that when she attempted to turn it was not an attempt to cross the *Pavonia's* bows again.

Without proceeding to analyze the other requests in detail, it is sufficient to say that they are all affected by the same class of error, or they assume the presentation to the jury of other propositions which have been refused.

Upon an examination of the whole record we see no reason for disturbing the conclusion reached by the jury. There was a conflict of evidence as to the position of these boats, and as to what was done as they were approaching each other, and the jury were justified, if the version of the conduct of those in charge of the *Pavonia* was as described by the plaintiff's witnesses, that the collision was caused by the management of that boat, and not by any fault of the *Emmons*.

The judgment and order should be affirmed, with costs.

O'Brien and Parker, JJ., concurred.

Judgment and order affirmed, with costs.